IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEPHEN SONNEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-10-4109 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment (Doc. No. 19) and Defendant's cross Motion for Summary Judgment (Doc. No. 13). After considering the cross motions for summary judgment, the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is DENIED, Plaintiff's Motion for Summary Judgment is GRANTED, and this matter is REMANDED to the Commissioner of the Social Security Administration for further proceedings.

## I. Introduction

Plaintiff Stephen Sonnen (Sonnen) brings this action pursuant to Section 405(g) of the Social Security Act (Act), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration (Commissioner) denying his

1

application for disability insurance benefits.  Sonnen argues that substantial evidence does not

support the Administrative Law Judge's (ALJ) decision and that the ALJ erred because: (1) he

unlawfully picked and chose conclusions from the medical record; (2) he failed to provide a

reviewable explanation for the weight he gave to Debra Salar's[1] testimony; (3) he "did not

follow the correct legal standards in evaluating the materiality of Mr. Sonnen's 'substance

abuse;'" and (4) he failed to account for the cyclical nature of bipolar disorder in making his

residual functional capacity (RFC) assessment.  (Doc. No. 20).  The Commissioner, in contrast,

argues that there is substantial evidence in the record to support the ALJ's findings and his

disability decision, that the decision comports with applicable law, and that it should therefore be

affirmed.  (Doc. No. 21).

## II. Administrative Proceedings

On May 15, 2008, Sonnen applied for Social Security Disability Insurance Benefits

(DIB), claiming that he "became unable to work because of [his] disabling condition on January

1, 1984." (Tr. 119).  Sonnen claimed that he is disabled because of bipolar disorder, depression,

poor concentration, low self-esteem, and irritable mood.  (Tr. 76).  On August 13, 2008, the

Social Security Administration denied his claim and on October 13, 2008, the Social Security

Administration denied his claim again on reconsideration.  (Tr. 76-77, 83-84).  After that,

Sonnen requested a hearing before an ALJ.  (Tr. 87).  The Social Security Administration

granted his request and the ALJ, Gary J. Suttles, held a hearing on November 19, 2009, at which

Sonnen's claims were considered *de novo*.  (Tr. 27).  On December 18, 2009, the ALJ issued his

decision finding that Sonnen "has not been under a disability, as defined in the Social Security

---

[1] Debra Salar was also referred to as "Sehba Sarwar" and "Debra Sarwar" in various documents.  (Doc. Nos. 20, 25; Tr. 16).  It is unclear what her correct name is, however, at the hearing she testified that her name is Debra Salar. (Tr. 48).  For that reason, she will be referred to as Debra Salar throughout this memorandum.

Act, from January 1, 1984 through [December 18, 2009]." (Tr. 21).  The ALJ found that Sonnen

met "the insured status requirements of the Social Security Act through September 30, 2009,"

and that Sonnen "has engaged in substantial gainful activity since January 1, 1984, the alleged

onset date." (Tr. 13).  At step two, the ALJ found that Sonnen's severe impairments are "bipolar

disorder and drug and alcohol abuse." (Tr. 13).  At step three, the ALJ found that Sonnen "does

not have an impairment or combination of impairments that meets or medically equals one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 14).  At step four, the ALJ

concluded that Sonnen

> has the residual functional capacity on a sustained basis for a significant period of
> time (e.g. five days a week job, 8 hours per day, day after day, week after week,
> month after month, with a ½ hours lunch break and ¼ hours break in the morning
> and in the afternoon) to perform a full range of work at all exertional levels as
> defined in 20 CFR 404.1567 and 416.967, but with the following nonexertional
> limitations: he can understand, remember and carry out simple instructions and
> tasks, has the ability to get along with others and respond and adapt to workplace
> changes and supervision.

(Tr. 15).  The ALJ further found that Sonnen "has not been unable to perform past relevant work

since the alleged onset date of disability." (Tr. 20).  In the alternative, the ALJ also found that

"there are other jobs that exist in significant numbers in the national economy that the claimant

also can perform . . . such as small products assembler (1,100 jobs regionally and 205,000

nationally); mail clerk (1,400 jobs regionally and 290,000 nationally); and office cleaner (1,300

jobs regionally and 250,000 nationally)." (Tr. 20-21).  The ALJ, using section 204.00 of the

Medical-Vocational Guidelines as a framework, concluded Sonnen was not disabled within the

meaning of the Act. (Tr. 21).

Sonnen sought review of the ALJ's adverse decision with the Appeals Council.  The

Appeals Council will grant a request to review an ALJ's decision if any of the following

circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970; 20 C.F.R. § 416.1470.  After considering Sonnen's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on September 10, 2010, that there was no basis upon which to grant Sonnen's request for review.  (Tr. 1-3).  The ALJ's findings thus became final.

Sonnen filed a timely appeal of the ALJ's decision.  Both sides have filed Motions for Summary Judgment.  (Document Nos. 13,19).  This appeal is now ripe for ruling.

### III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits "is limited to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its]

4

judgment for that of the [Commissioner] even if the evidence preponderates against the

[Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones*, 174

F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  "Conflicts in the evidence are

for the [Commissioner] to resolve."  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act,

to be "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.

N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a mere scintilla, and less

than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must

create more than "a suspicion of the existence of the fact to be established, but 'no substantial

evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no

contrary medical evidence.'"  *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1983) (quoting

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

**IV. Burden of Proof**

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving his disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§423(d)(1)(A). The impairment must be proven through "medically accepted clinical and

laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). The impairment must be so severe as

to limit the claimant in the following manner:

he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in *any* substantial gainful activity." *Anthony*, 954 F.2d 289, 293 (emphasis in original) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, she will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v.*

*Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In this appeal, the Court must determine whether substantial evidence supports the ALJ's RFC finding and whether the ALJ used the correct legal standards in arriving at that conclusion. In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Evidence

The objective medical evidence shows that Sonnen suffers from bipolar disorder. The oldest medical records on file are outpatient records from the Harris County Hospital District dated January 14, 2006, February 25, 2006, and March 14, 2006. (Tr. 184-86). The records from each of these dates show a diagnosis of bipolar disorder. *Id.* During Sonnen's February 25 visit he was given a global assessment of functioning (GAF) score of 65. [2] (Tr. 185).

On June 2, 2006, Sonnen was seen by Dr. Trina Cormack at the Mental Health Mental Retardation Authority (MHMRA) of Harris County for a psychiatric assessment. (Tr. 188-90).

---

[2] A GAF score is a numerical indicator of a patient's overall functioning level. A score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." ACCESS BEHAVIORAL HEALTH, GLOBAL ASSESSMENT OF FUNCTIONING 1, 3, *available at* http://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf.

On a scale of zero to ten, with zero meaning no symptoms, five meaning moderate symptoms, and ten meaning extreme symptoms, Dr. Cormack gave Sonnen's core symptoms a rating of two, his mania a rating of four, and his depression a rating of one. (Tr. 188). In the mental status examination, Sonnen was described as neatly groomed and cooperative; his mood was dysthymic; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was limited; and judgment was fair. (Tr. 189). Dr. Cormack indicated that the presenting problem was a thirty-four year old with bipolar disorder "and polysubstance dependence-currently using mj and alcohol." (Tr. 188). However, later in the same treatment note, Dr. Cormack described Sonnen's substance abuse history as "alcohol, MJ, ecstasy, heroin methamphetamines acid and mushrooms. in (sic) HS. now (sic) drinks alcohol 2-3 drinks twice per month and and (sic) smokes MJ once per month." (Tr. 189). Furthermore, toward the end of the three page record, in the "Case Formulation" section, Dr. Cormack described Sonnen as a thirty-four year old with bipolar disorder, a history of psychotic features, and a history of "substance experimentation but no overt dependency issues." *Id.*

On July 10, 2006, Sonnen visited Dr. Cormack for medication maintenance. Dr. Cormack gave Sonnen's core symptoms a rating of two, his mania a rating of four, his depression a rating of one, his overall side effect severity a rating of one, and his overall functioning a rating of seven. (Tr. 238). In the mental status examination, Sonnen was described as neatly groomed and cooperative; his mood was dysthymic; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was limited; and judgment was fair. (Tr. 239). In the

8

"Progress Note" section, Dr. Cormack described Sonnen as a thirty-four year old with bipolar disorder who is compliant with his medications without side effects and has no current substance use. *Id.* In the "Assessment" section, Dr. Cormack wrote "H/O substance use-no dependency issues." *Id.*

On September 5, 2006, Sonnen visited Dr. Cormack for an adjustment to his medication. The report is identical to the July 10, 2006, report except for the "Progress Note" section. (Tr. 233-35). Here, Dr. Cormack noted that Sonnen is a thirty-four year old "with bipolar disorder here for early visit due to increase depressive complaints." (Tr. 234). Dr. Cormack further noted that Sonnen was "compliant with meds without side effects except [Sonnen] not taking trazodone." *Id.* Again, Dr. Cormack noted that there is no current substance use. *Id.*

On October 30, 2006, Sonnen visited Dr. Cormack for medication maintenance. The report is identical to the July 10, 2006, report except for the "Progress Note" section. (Tr. 229-31). In the progress note, Dr. Cormack noted that Sonnen has bipolar disorder, is compliant with his medications, and that there is no current substance use. (Tr. 230).

On December 7, 2006, Sonnen visited Dr. Cormack for medication maintenance. The report is identical to the July 10, 2006 report except for the "Progress Note" section. (Tr. 225-27). In the progress note, Dr. Cormack noted that Sonnen has bipolar disorder, is compliant with his medications, "is having some work stressors," is depressed in the mornings but his mood improves throughout the day, and that there is no current substance use. (Tr. 226).

On January 22, 2007, Sonnen's urine was tested. The results showed no drug or alcohol abuse. (Tr. 269-70).

On January 29, 2007, Sonnen visited Dr. Cormack for medication maintenance. The report is identical to the July 10, 2006 report except for the "Progress Note" section. (Tr. 221-23). In the progress note, Dr. Cormack noted that Sonnen has bipolar disorder, is compliant with his medications without side effects, "has been having a 'blue spell' due to work stressors," and that there is no current substance use. (Tr. 222).

On April 13, 2007, Sonnen visited Dr. Rogers for medication maintenance at MHMRA of Harris County. Dr. Rogers gave Sonnen's mania a rating of zero, his depression a rating of two, his overall side effect severity a rating of zero, and his overall functioning a rating of six. (Tr. 215). In the mental status examination, Sonnen was described as casually dressed and cooperative; his mood was euthymic; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was good; and judgment was good. (Tr. 216).

On June 11, 2007, Sonnen visited Dr. Rogers for medication maintenance. Dr. Rogers gave Sonnen's mania a rating of four, his depression a rating of three, his overall side effect severity a rating of zero, and his overall functioning a rating of eight. (Tr. 211). In the mental status examination, Sonnen was described as casually dressed and cooperative; his mood was euthymic; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was fair; and judgment was fair. (Tr. 212).

On August 15, 2007, Sonnen visited Dr. Vivi Daniel at MHMRA of Harris County for medication maintenance. Dr. Daniel gave Sonnen's core symptoms a rating of two, his mania a rating of four, his depression a rating of one, his overall side effect severity a rating of one, and

his overall functioning a rating of seven.  (Tr. 207).  In the mental status examination, Sonnen was described as neatly groomed and cooperative; his mood was dysthymic; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was limited; and judgment was fair.  (Tr. 208).  The "Progress Note" section is identical to Dr. Cormack's January 29, 2007, progress note, (Tr. 222), with the added note: "8/15/07 pt reports doing well at this time.  sleep (sic) and appetite good.  no (sic) hallu or delusions t (sic) this time. mental (sic) status seems stable." (Tr. 208).  In the "Assessment" section Dr. Daniel wrote that Sonnen has bipolar disorder with a history of psychotic features and a history of substance use with no dependency issues. *Id.*.

On October 24, 2007, Sonnen visited Dr. Dominic Joseph at MHMRA of Harris County for medication maintenance.  Dr. Daniel gave Sonnen's core symptoms a rating of two, his mania a rating of four, his depression a rating of one, his overall side effect severity a rating of one, and his overall functioning a rating of seven.  (Tr. 203).  In the mental status examination, Sonnen was described as neatly groomed and cooperative; his mood was dysthymic; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was limited; and judgment was fair.  (Tr. 204).  Sonnen reported that he is doing well on his medications; he denied suicidal thoughts or plans, auditory hallucinations, and visual hallucinations; and he claimed that he drinks alcohol occasionally but denied drug usage.  *Id.*  Dr. Joseph's assessment was that Sonnen has bipolar disorder with a history of psychotic features and a history of "substance use-no dependency issues." *Id.*

11

On December 18, 2007, Sonnen was seen by Dr. Jose Fernandez at MHMRA of Harris County for medication maintenance.  Dr. Fernandez wrote that Sonnen is "taking his medications with no side effects … [and] in general doing well with current medications."  (Tr. 200).  Dr. Fernandez noted that Sonnen has never been "admitted to psychiatric hospital but has been to NPC/BTGH," the NeuroPsychiatric Center (NPC) and the Ben Taub General Hospital (BTGH).  *Id.*  In the mental status examination, Sonnen was described as casually dressed and cooperative; his mood was euthymic; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was limited; and judgment was fair.  (Tr. 201).  Sonnen reported that he is doing well on his medications; he denied suicidal thoughts or plans, auditory hallucinations, and visual hallucinations; and he claimed that he drinks alcohol occasionally but denied drug usage.  *Id.*  Dr. Fernandez's assessment was that Sonnen has bipolar disorder with a history of psychotic features and a history of "substance use-no dependency issues."  (Tr. 201).

On February 26, 2008, Sonnen's urine was tested.  The results showed no drug or alcohol abuse.  (Tr. 267).  On the same day, Sonnen was seen by Dr. Fernandez.  Dr. Fernandez wrote that Sonnen is taking his medications and has "been feeling more depressed, and irritable since his apartment got broken into."  (Tr. 195).  He noted that Sonnen is "in general doing well with current medications."  *Id.*  Dr. Fernandez also noted that Sonnen has never been "admitted to psychiatric hospital but has been to NPC/BTGH."  *Id.*  In the mental status examination, Sonnen was described as neatly groomed and cooperative; his mood was depressed; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was fair; and

12

judgment was fair. (Tr. 196). Dr. Fernandez's assessment was that Sonnen has bipolar disorder with a history of psychotic features and a history of "substance use-no dependency issues." *Id.*

The records show that Sonnen first visited Dr. Lawrence Traylor, his psychologist, on April 7, 2008. (Tr. 264). Dr. Traylor's assessment was that Sonnen was cooperative with a logical thought process, he had a negative attitude toward self, and "his affect was dysphoric and mood frustrated." *Id.* Sonnen rated himself a seven out of ten, with ten being the most distressed, on the subjective units of distress (SUDS) scale. *Id.* Sonnen denied suicidal thoughts, homicidal thoughts, and excessive use of alcohol or drugs. *Id.* Sonnen stated "I'm putting in 40 to 50 hours and I'm not getting paid for it." *Id.* At the end of the session, Sonnen reported that he had improved from a seven to a five on the SUDS scale. *Id.*

On April 7, 2008, Sonnen was also seen by Dr. Fernandez. Dr. Fernandez wrote that Sonnen is taking his medications and has "been feeling more depressed. He is tired of his work as they are meking (sic) him work extra, but with no additional pay." (Tr. 191). Sonnen claimed he is doing worse, and is starting to look for another job. *Id.* Dr. Fernandez also noted that Sonnen has never been "admitted to psychiatric hospital but has been to NPC/BTGH." *Id.* In the mental status examination, Sonnen was described as neatly groomed and cooperative; his mood was depressed; affect was appropriate; thought process was goal directed; hallucinations, suicidal ideations, and homicidal ideations were absent; sensorium was alert; cognition was grossly intact; insight was fair; and judgment was fair. (Tr. 196). Dr. Fernandez's assessment was that Sonnen has bipolar disorder with a history of psychotic features and a history of "substance use-no dependency issues." (Tr. 192).

On April 21, 2008, Sonnen was seen by Dr. Traylor.  Dr. Traylor's assessment was that Sonnen was cooperative with a logical thought process, he had a somewhat positive attitude toward self, and "his affect was dysphoric and mood frustrated." (Tr. 263).  Sonnen rated himself a five out of ten on the (SUDS) scale.  *Id.*  Sonnen denied suicidal thoughts, homicidal thoughts, and excessive use of alcohol or drugs.  *Id.*  Sonnen stated "They're going to start laying people off for two or three months because of the budget."  *Id.*  At the end of the session, Sonnen reported that he had improved from a five to a three on the SUDS scale.  *Id.*

On May 5, 2008, Sonnen was seen by Dr. Traylor.  Dr. Traylor's assessment was that Sonnen was cooperative with a logical thought process, he had a somewhat negative attitude toward self, and "his affect was dysphoric and mood frustrated." (Tr. 262).  Sonnen rated himself a five out of ten on the SUDS scale.  *Id.*  Sonnen denied suicidal thoughts, homicidal thoughts, and excessive use of alcohol or drugs.  *Id.*  Sonnen stated "I've been officially laid off from work.  I don't know what to do."  *Id.*  At the end of the session, Sonnen reported that he had improved from a five to a three on the SUDS scale.  *Id.*

On May 19, 2008, Sonnen was seen by Dr. Traylor.  Dr. Traylor's assessment was that Sonnen was cooperative with a logical thought process, he had a somewhat negative attitude toward self, and "his affect was dysphoric and mood frustrated." (Tr. 260).  Sonnen rated himself a five out of ten on the SUDS scale.  *Id.*  Sonnen denied suicidal thoughts, homicidal thoughts, and excessive use of alcohol or drugs.  *Id.*  Sonnen stated "I don't have any income and I don't know what to do.  I feel like a failure."  *Id.*  At the end of the session, Sonnen reported that he had improved from a five to a three on the SUDS scale.  *Id.*

14

On June 2, 2008 Sonnen was seen by Dr. Traylor.  Dr. Traylor's clinical observations were Sonnen was cleanly groomed and casually dressed, cooperative and polite, he had a somewhat negative attitude toward self, and "his affect was anxious and mood dysphoric."  (Tr. 259).  Sonnen reported recent thoughts of suicide without a plan but denied homicidal thoughts and excessive use of alcohol or drugs.  *Id.*  Dr. Traylor wrote that "Sonnen is experiencing difficulty coping, having lost his job.  His symptoms have significantly increased in terms of depression and anxiety.  His self-esteem and self-concept is very very low and he is not handling his life circumstances very well.  Therapist recommends continued medication regimen and psychotherapy to address his issues."  *Id.*

On the same day, Dr. Traylor also filled out a form titled "Adult Mental Health SPP2-4 and Intensive SP1 Treatment Plan."  On a scale of one to five, with one indicating none and five indicating high,[3] Dr. Traylor gave Sonnen the following Adult TRAG Dimension Results: Risk of Harm, two; Support Needs, two; Psychiatric Related Hospitalizations, one; Functional Impairment, three; Employment Problems, five; Housing Instability, one; Co-Occurring Substance Abuse, one; and Criminal Justice Involvement, one.  (Tr. 248).  Dr. Traylor noted that Sonnen's strengths were "History of treatment compliance," and "Motivated for treatment."  *Id.* Dr. Traylor described Sonnen as a thirty-six year old male with a history of bipolar disorder "currently experiencing symptoms of acute anxiety attacks, anger outbursts at least 15x [per week].  He experiences chronic memory loss, mood swings, confusion, self-criticality, feelings of worthlessness, suicidal ideations, irritability, lack of energy and sleep difficulties. . . . Patient recently lost his job of four years and his symptoms have significantly increased."  (Tr. 252).

---

[3] Texas Dept. of State Health Services, "USER'S MANUAL FOR THE ADULT TEXAS RECOMMENDED ASSESSMENT GUIDELINES (Adult-TRAG)," December 2010, at http://www.dshs.state.tx.us/mhprograms/RDMTRAG.shtm.

Under goals, Dr. Traylor wrote that "[c]onsumer will take medications as prescribed to decrease symptoms as demonstrated by keeping appointments with doctor . . . [and] will have a increase (sic) in control over impulses and stablize (sic) mood as demonstrated by a reductions (sic) in impulsive drug and alcohol use, and anger outbursts to no more than one per month."  (Tr. 249).

On June 11, 2008, Sonnen was seen by Dr. Traylor.  Dr. Traylor's assessment was that Sonnen was cooperative with a logical thought process, he had a somewhat negative attitude toward self, and "his affect was dysphoric." (Tr. 258).  Sonnen rated himself a five out of ten on the SUDS scale.  *Id.*  Sonnen denied suicidal thoughts, homicidal thoughts, and excessive use of alcohol or drugs.  *Id.*  Sonnen stated "Those bartending jobs did not turn out to be as many as I thought. I don't know where to turn."  *Id.*  At the end of the session, Sonnen reported that he had improved from a five to a four on the SUDS scale.  *Id.*

On June 16, 2008, Sonnen was seen by Dr. Fernandez at MHMRA of Harris County for medication maintenance.  Dr. Fernandez wrote that Sonnen is "taking his medications with no side effects, he has been felling (sic) less depressed, but more anxious and irritable. . . .  he has some suicidal ideas[,] . . . claims he is doing worse, and is starting to look for another job."  (Tr. 255).   Dr. Fernandez noted that Sonnen has never been "admitted to psychiatric hospital but has been to NPC/BTGH."  *Id.*  In the mental status examination, Sonnen was described as neatly groomed, casually dressed, and cooperative; his mood was depressed; affect was appropriate; thought process was goal directed; hallucinations and homicidal ideations were absent, but suicidal ideations were present; sensorium was alert; cognition was grossly intact; insight was fair; and judgment was fair.  (Tr. 255-56).  Dr. Fernandez's assessment was that Sonnen has

bipolar disorder with a history of psychotic features and a history of "substance use-no dependency issues." (Tr. 256).

On July 9, 2008, Sonnen was seen by Dr. Traylor. Dr. Traylor's assessment was that Sonnen was cooperative with a logical thought process, he had a somewhat positive attitude toward self, and "his mood was normal and his affect was euthymic." (Tr. 287). Sonnen rated himself a three out of ten on the SUDS scale. *Id.* Sonnen denied suicidal thoughts, homicidal thoughts, and excessive use of alcohol or drugs. *Id.* At the end of the session, Sonnen reported that he had improved from a three to a two on the SUDS scale. *Id.*

On July 23, 2008, Sonnen was seen by Dr. Traylor. Dr. Traylor's assessment was that Sonnen was cooperative with a logical thought process, he had a somewhat negative attitude toward self, and "his mood was depressed and his affect was dysthymic." (Tr. 286). Sonnen rated himself a seven out of ten on the SUDS scale. *Id.* Sonnen reported suicidal thoughts without a plan, denied homicidal thoughts, and denied excessive use of alcohol or drugs. *Id.* Sonnen stated, "I can't find a job and beginning to feel like giving up." *Id.* At the end of the session, Sonnen reported that he had improved from a seven to a six on the SUDS scale. *Id.*

On August 20, 2008, Sonnen was seen by Dr. Traylor. Dr. Traylor's observations were that Sonnen was cleanly groomed and casually dressed, cooperative and polite with a logical thought process, he had a somewhat negative attitude toward self, and "[h]is affect was dysthymic and mood depressed." (Tr. 285). Sonnen reported suicidal thoughts without a plan, denied homicidal thoughts, and denied excessive use of alcohol or drugs. *Id.* Dr. Traylor noted that "Sonnen continues to experience difficulty coping with stressors. He continues to struggle

17

with maladaptive emotional patterns and coping styles that often leave him feeling empty, dissonant and at times suicidal." *Id.*

On the same day, Dr. Traylor also filled out a form titled "Adult Mental Health SPP2-4 and Intensive SP1 Treatment Plan." On a scale of one to five, with one indicating none and five indicating high,[4] Dr. Traylor gave Sonnen the following Adult TRAG Dimension Results: Risk of Harm, two; Support Needs, three; Psychiatric Related Hospitalizations, one; Functional Impairment, three; Employment Problems, five; Housing Instability, two; Co-Occurring Substance Abuse, one; and Criminal Justice Involvement, one. (Tr. 274). Dr. Traylor noted that Sonnen's strengths were "[h]istory of treatment compliance [and] [m]otivated for treatment." *Id.* Dr. Traylor also described Sonnen as having a history of bipolar disorder "that includes current symptoms of acute anxiety, and anger outbursts at least 15x week." (Tr. 275). He noted that Sonnen has "[c]hronic and daily mood swings, self-criticality, feelings of worthlessness, helplessness, suicidal ideations, sleep difficulties, confusion, short-term memory loss, lack of energy, and irritability." *Id.* In describing Sonnen's progress, Dr. Traylor wrote "[p]atient reports chronic and persistent anxiety depression, self-criticality, feelings of hopelessness, worthlessness and lack of energy. Patient states, 'all I want to do is stay in bed.'" (Tr. 278). Under goals, Dr. Traylor wrote "[c]onsumer will take medications as prescribed to decrease symptoms as demonstrated by keeping appointments with doctor . . . [and] will have a increase (sic) in control over impulses and stablize (sic) mood as demonstrated by a reductions (sic) in impulsive drug and alcohol use, and anger outbursts to no more than one per month." (Tr. 275).

---

[4] *Supra*, note 3.

On August 28, 2008, Sonnen was seen by Dr. Fernandez at MHMRA of Harris County for medication maintenance. Dr. Fernandez wrote that Sonnen is "taking his medications with no side effects, he has been felling (sic) less anxious, but more depressed." (Tr. 281). Sonnen reported that he had only been taking two tabs of Wellbutrin instead of the prescribed three. *Id.* In the medication response section, Dr. Fernandez lowered Sonnen's Wellbutrin prescription from three tablets to two. (Tr. 282). Sonnen also claimed that he was having suicidal ideations without a plan. (Tr. 281). Dr. Fernandez noted that Sonnen has never been "admitted to psychiatric hospital but has been to NPC/BTGH." *Id.* In the mental status examination, Sonnen was described as neatly groomed, casually dressed, and cooperative; his mood was depressed; affect was appropriate; thought process was goal directed; hallucinations and homicidal ideations were absent, but suicidal ideations were present; sensorium was alert; cognition was grossly intact; insight was fair; and judgment was fair. (Tr. 281-82). Dr. Fernandez's assessment was that Sonnen has bipolar disorder with a history of psychotic features and a history of "substance use-no dependency issues." (Tr. 282).

On September 3, 2008, Sonnen was seen by Dr. Traylor. Dr. Traylor's assessment was Sonnen was cooperative, he had a somewhat positive attitude toward self, and his "mood appeared anxious and affect was dysphoric." (Tr. 284). Sonnen rated himself a four out of ten on the SUDS scale. *Id.* Sonnen denied suicidal thoughts, homicidal thoughts, and excessive use of alcohol or drugs. *Id.* At the end of the session, Sonnen reported that he had improved from a four to a two on the SUDS scale. *Id.*

Having reviewed the objective medical evidence in the record, it is clear that Sonnen suffers from bipolar disorder and has suffered from bipolar disorder since at least January 14,

2006.  (Tr. 186).  However, objective medical facts also support the ALJ's finding that Sonnen's

symptoms are "relatively mild to moderate."  (Tr. 17).  Sonnen's symptoms were consistently

rated as less than moderate by three different doctors.  (Tr. 203, 207, 211, 215, 221, 225, 229,

233, 238).  Additionally, Sonnen's treating physicians and psychologist unfailingly noted that

Sonnen was either neatly groomed or casually dressed, was cooperative, had an appropriate

affect, had goal oriented thought process, had grossly intact cognition, had at least limited insight

(often times fair), had at least fair judgment, had no homicidal thoughts, and only occasionally

had suicidal thoughts.  (Tr. 188-238, 249-69, 274-87).  Sonnen's GAF scores ranged from fifty-

five to sixty-five; also an indication of only moderate symptoms.[5]  (Tr. 185, 294, 323).

The ALJ found that "[a]ny periods of severe functional loss or increased symptomology

have been the result of loss of employment, drug use or noncompliance with medications."  (Tr.

17).  To support this finding the ALJ wrote:

> In June 2008, the claimant reported worsening of his symptoms, such as feelings
> of worthlessness and decreased self-esteem and self-concept.  However, the
> claimant reported that these increased depressive symptoms were the result of
> losing his job (Exhibit 3F/11).  Additionally, the physician noted that part of the
> treatment goals was taking medications as prescribed to decrease symptoms as
> demonstrated by keeping appointments with his doctor.  The physician also noted
> that part of the treatment goal was an increase in control over impulses and
> stabilization of his mood as demonstrated by reductions in impulsive drug and
> alcohol use, and anger out bursts to no more than one per month (Exhibit 3F/8).
> This is consistent with records showing prior drug use and the claimant's own
> testimony revealing recent drug use.  Notably, only two weeks later, the claimant
> reported compliance with his medications and improvement in his symptoms.
> Although he claimed feeling more anxious and irritable, he felt less depressed. . . .

---

[5] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat and circumstantial speech, occasional
panic attacks) OR moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with
co-workers)" and a GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild
insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within
the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  ACCESS
BEHAVIORAL HEALTH, GLOBAL ASSESSMENT OF FUNCTIONING 3, *available at*
http://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf.

Subsequent notes show that claimant was not completely compliant with his medications. An August 2008 treatment note recorded that the claimant was only taking two tabs of his depression medications, instead of the recommended three tabs (Exhibit 4F/11). It is well settled that an impairment that is controlled or controllable with appropriate treatment cannot be made the basis of a finding of disability.

(Tr. 17-18). The treatment goals that the ALJ is referencing read in full:

Goals: Psychiatric Symptoms:

Consumer will participate in individual psychotherapy (CBT) for a minimum of three months and attend twice per month to address psychogenic stressors, dysfunctional beliefs, maladaptive emotional patterns and coping styles. Consumer will increase his understanding of situations that lead his (sic) feelings of helplessness, worthlessness, and suicidal ideations. *Consumer will take medications as prescribed to decrease symptoms as demonstrated by keeping appointments with doctor.*

Decrease dysfunctional thinking and increase positive, self-enhancing expression as evidenced by identifying at least five positive affirmations and using at least one on a daily basis for the next three months.

Patient will report weekly circumstances when they are able to replace negative self-defeating thinking with positive, accurate, self-enhancing self-talk in the next three months.

Reduction of anxiety-related stress by setting boundaries with others including giving feedback and refusing requests as evidenced by engaging in assertive communication on a weekly basis for the next three months.

*Patient will have a increase (sic) in control over impulses and stabilize mood as demonstrated by reductions in impulsive drug and alcohol use, and anger outbursts to no more than one per month.*

(Tr. 249, 275) (emphasis added). It appears that the ALJ found that there were period of severe functional loss and increased symptomology but discounts them as either attributable to drug use and not bipolar disorder or, if such periods were due to Sonnen's bipolar disorder, this was only because Sonnen was not complying with his medications. Substantial evidence does not support

the ALJ's finding that drug use and/or noncompliance with medication contributed to periods of increased symptomology or severe functional loss.

Substantial evidence does not support the ALJ's finding that drug use contributed to these periods because the ALJ (1) engaged in inappropriate picking and choosing of conclusions from the medical opinions, and (2) he has mischaracterized Sonnen's testimony and the medical records. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("The ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position.").

First, by relying on small fractions of medical records that are at odds with the majority of the objective medical evidence, the ALJ engaged in inappropriate picking and choosing of conclusions from the medical opinions. The phrase to which the ALJ points to support his drug and alcohol abuse claim is one of only two instances in the entire record in which this language appears and there is only one other record with language expressing possible concern for drug or alcohol abuse. (Tr. 188, 249, 275). The third record that contains a suggestion of drug or alcohol abuse is from Sonnen's first visit to MHMRA of Harris County. (Tr. 190).

Notably, in all three of these records, suggestions of possible drug or alcohol abuse are contradicted by other parts of the same records. (Tr. 189, 248, 274). The two records the quote was pulled from contained a rating of one for Sonnen's "Co-Occurring Substance Abuse" on a scale of one to five, with one indicating none and five indicating high.[6] (Tr. 248, 274). On the first page of the third record, Dr. Cormack indicated that the presenting problem was a thirty-four year old with bipolar disorder "and polysubstance dependence-currently using mj and alcohol." (Tr. 188). However, later in that record, Dr. Cormack described Sonnen's substance

---

[6] *Supra*, note 3.

22

abuse history as "alcohol, MJ, ecstasy, heroin methamphetamines acid and mushrooms. in (sic) HS. now (sic) drinks alcohol 2-3 drinks twice per month and and (sic) smokes MJ once per month." (Tr. 189). Toward the end of the three page record, in the "Case Formulation" section, Dr. Cormack wrote that Sonnen has a history of "substance experimentation but no overt dependency issues." *Id.* Furthermore, in a large portion of the medical records there is either the phrase "no overt dependency issues," (Tr. 189), "no dependency issues," (Tr. 196, 201, 204, 208, 222, 226, 230, 234, 239, 256, 282), or "no current substance use," (Tr. 208, 222, 226, 230, 234, 239). In addition, there are two urine tests in the medical records, both of which show no indication of drug or alcohol abuse. (Tr. 267, 269-70). During every visit to Dr. Traylor, Sonnen denied excessive use of alcohol or drugs and nothing in Dr. Traylor's records indicates doubt as to the truth of this statement.. (Tr. 249, 258-60, 262-64, 274, 284-87). These three instances cannot be regarded as "more than a scintilla," of evidence showing substance abuse, in light of the fact the medical records are replete with evidence suggesting that Sonnen does not engage in material substance abuse. Therefore, finding that Sonnen engages in substance abuse is the result of inappropriate picking and choosing conclusions from the medical records and is not supported by substantial objective medical evidence.

Second, when the ALJ claims that impulsive drug and alcohol use "is consistent with records showing prior drug use and the claimant's own testimony revealing recent drug use," he is mischaracterizing both the records that he references and Sonnen's testimony. During the hearing, the ALJ briefly questioned Sonnen about drug or alcohol abuse:

Q: Do you have any issues with pot or alcohol?

A: No, sir.

Q: When is the last time you had any pot?

A: I did in, it was either late January or it was in February[, 2009]. It was a one time thing.

Q: Okay, and who were you doing it with?

A: A friend of mine had come over and he brought another friend and I was just so depressed. I'm sorry. I wanted to try, I wanted to see if I could laugh.

Q: Okay. How about when is the last time you did any heroin?

A; Oh my God. I did that once when I was in high school.

Q: Meth?

A: High school.

Q: Okay. How about Ecstasy?

A: High school.

. . .

Q: How about as far your alcohol consumption? What's that a month?

A: I don't really drink. I had a glass of wine I think two or three weeks ago. Before that I don't remember. They interfere with my medication. It just makes me really sleepy.

(Tr. 44-45). This testimony is not consistent with a finding that Sonnen engages in impulsive drug or alcohol use. Additionally, the medical records are consistent with Sonnen's testimony and not with a finding that he engages in impulsive drug or alcohol use. As outlined above, the records show no current substance abuse. The records that do mention prior drug use contain one of three phrases: "alcohol, MJ ecstasy, heroin methamphetamines acid and mushrooms in HS. now (sic) drinks alcohol 2-3 drinks twice per month and and (sic) smokes MJ once per month," "[history of] substance experimentation but no overt dependency issues," or "[history of] substance use-no dependency issues." (Tr. 189, 196, 201, 204, 208, 222, 226, 230, 234, 239, 256, 282.). None of these phrases convey that Sonnen engages in impulsive drug or alcohol use.

The ALJ is mischaracterizing the records and Sonnen's testimony when he claims that a finding of impulsive drug and alcohol use is consistent with them.

Because the ALJ mischaracterized Sonnen's testimony and the medical records and engaged in inappropriate picking and choosing of conclusions from the medical records to find that Sonnen's "drug use" contributed to "any periods severe functional loss," substantial evidence does not support this finding.

Similarly, substantial evidence does not support the ALJ's finding that noncompliance with medications has contributed to periods of severe functional loss or increased symptomology.  In so finding, the ALJ mischaracterized the medical records and again engaged in impermissible picking and choosing conclusions from the medical record.

Regarding mischaracterization of the records, the ALJ noted that two weeks after an instance of noncompliance Sonnen "reported compliance with his medications and improvement in his symptoms.  Although he claimed feeling more anxious and irritable, he felt less depressed."  (Tr. 18).  The note that the ALJ takes this information from reads:

> 36 y/o with Bipolar disorder here for f/u.  Patient taking his medications with no side effects, he has been felling (sic) less depressed, but more anxious, and irritable.  Patient also with more problems sleeping.  Mostly staying asleep, but sometimes falling asleep as well.  Patient with chronic psoriasis.  Appetite is now decrease, (sic) but he eats snacks.  His weight has been stable, but he is not sure because he has no scale.  Patient is cooperative with interview.  Denied any Ah/Vh.  He has some suicidal ideas, but denied any plans, and he denied any hi.  *Patient claims he is doing worse*, and is starting to look for another job.

(Tr. 255) (emphasis added).  Considering the last sentence of the above quote, it is misleading for the ALJ to claim that Sonnen reported improvement in his symptoms during this visit because it implies overall improvement which is not reflected in the record.

25

The ALJ's picking and choosing among conclusions from the medical record to find that Sonnen is often noncompliant with his medications is similar to the manner in which he concluded that Sonnen has substance abuse problems.  The quote the ALJ uses to support his claim of noncompliance appears twice in the medical records: once in a June 2, 2008 Adult Mental health SP2-4 and Intensive SP1 Treatment Plan and once in an August 20, 2008 Adult Mental health SP2-4 and Intensive SP1 Treatment Plan.  (Tr. 249, 275).  First, it is somewhat of a stretch to conclude that Sonnen is noncompliant from the quote itself which reads in relevant part "[c]onsumer will take medications as prescribed to decrease symptoms as demonstrated by keeping appointments with doctor." (249, 275).  Nothing in this sentence directly says that Sonnen is noncompliant although, the sentence does come from a "Goals" section of the record, which could imply that he is not compliant and the goal is to become compliant.  Earlier in both of these records, however, "[h]istory of treatment compliance" and "[m]otivated for treatment" are listed as Sonnen's strengths, reducing the likelihood that the quote means that Sonnen is currently noncompliant.

The ALJ mentions another record from August, 2008 which allegedly shows that Sonnen is noncompliant with his medication.  (Tr. 18).  This record is of a medication maintenance visit to Dr. Fernandez on August 28, 2008.  (Tr. 281).  Dr. Fernandez notes that "[Sonnen] has not been taking the 3 tabs of Wellbutrin XL 150-mg.  He is only taking 2 tabs."  *Id.*  Whether or not this is actual noncompliance however, is questionable because the same record shows Dr. Fernandez adjusted Sonnen's Wellbutrin prescription to two tabs: "Wellbutrin XL to 150-mg 2 tabs po qam."  (Tr. 282).

26

The only other record hinting at the possibility of noncompliance is a record dated September 5, 2006 in which Dr. Cormack notes that Sonnen is "compliant with meds without side effects except pt not taking trazodone." (Tr. 234). This is unrelated because Trazodone was prescribed to Sonnen for insomnia, not depression or mood swings. *Id.*

Considering the complete absence of anything more than a minor indication of noncompliance or concern for noncompliance in over two and a half years of lengthy medical records and the somewhat routine appearance of phrases like "compliant with meds without side effects," (Tr. 208, 222, 226, 230, 239), and "[p]atient taking his medications with no side effects," (Tr. 191, 195, 200, 255), these instances of alleged noncompliance cannot be regarded as "more than a scintilla," of evidence showing noncompliance. Therefore, finding that Sonnen is noncompliant with his prescribed medications, in the grand scheme, and in the instance specifically cited by the ALJ, in which Sonnen was allegedly noncompliant and doing worse and later compliant and improved, is the result of picking and choosing conclusions from the medical records and mischaracterization of medical records. Thus, this finding is not supported by substantial objective medical evidence.

In conclusion, while there is substantial objective medical evidence to suggest that Sonnen's symptoms are relatively mild to moderate, there is not substantial objective medical evidence to support the ALJ's finding that drug use or noncompliance with medications were the cause of any periods of severe functional loss or increased symptomology. To the contrary, the objective medical evidence shows that Sonnen does not engage in substance abuse and is compliant with medications. To support his finding, the ALJ engaged in impermissible picking and choosing of medical conclusions and mischaracterized both the medical records and

27

Sonnen's testimony.  Therefore, the objective medical evidence factor does not support the ALJ's decision to the extent that any of his conclusions are based on, or affected by, the ALJ's belief that Sonnen abused drugs or alcohol and was noncompliant with his medication.

## B. Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability.").  In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981).  Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore*, 919 F.2d at 905).

In the decision, the ALJ thoroughly summarized and weighed the diagnosis and expert opinion:

28

On July 28, 2008, the claimant underwent a psychological evaluation at the request of Disability Determination Services. The claimant reported subjective symptoms consistent with his previous reports, but similarly consistent, the examining psychologist found the claimant's impairment to present at best moderate difficulties in functioning. The claimant reported that on a typical day he gets up, reads things on the internet and when he gets tired of that, he watches the news on television then does some cleaning and cooking. He reported independence with activities of daily living, such as bathing, grooming, dressing and using the bathroom, but stated that he has trouble scheduling, so his father gave him a PDA (personal digital assistant) so he could write things down. The claimant also reported problems with social functioning and completing tasks. During the mental status examination, the claimant exhibited good hygiene and grooming. Eye contact was sustained and speech was talkative. The claimant expressed having suicidal ideations, but no actual plans. He further stated that he has some auditory hallucinations, but no visual hallucinations. His mood was calm and he was oriented to day of the week. Recent memory was good and immediate memory was fair. He could perform simple addition problems, but had difficulty with simple subtraction problems. However, his fund of information and intelligence appeared to be in the average range. Insight and judgment appeared fair. The examining psychologist gave a provisional diagnosis of bipolar disorder and a GAF score of 57, which is consistent with earlier records suggesting only moderate symptoms or difficulties in social, occupational or school functioning (Exhibit 5F).

As for the opinion evidence, on May 7, 2009, Lawrence H. Traylor, EdD, LPC completed several medical assessment forms concerning the claimant (Exhibit 9F). Evaluating the claimant under 12.04 of the listing, Traylor reported that the claimant satisfied the requirements under the "paragraph A" criteria and demonstrated marked limitations in each of the first three functional areas under the "paragraph B" criteria, along with four or more episodes of decompensation, each of extended duration (Exhibit 9F/4). Traylor also indicated that the claimant satisfied the "paragraph C" criteria under listing 12.04 (Exhibit 9F/5).

A medical source statement from an examining source is normally entitled to great weight; however, it cannot be wholly conclusory and must be supported by objective clinical findings (20 C.F.R. 404.1527(d)(2) through (d)(6) and 416.927(d)(2) through (d)(6)). Medical source statements are to be based on the medical sources' records and examination of the individual (SSR 96-5p). Here, the medical record of evidence fails to support the extreme assessments made by the claimant's psychotherapist. Traylor in his most recent note indicated that the claimant's attitude was cooperative and his attitude toward self was somewhat positive. Although the claimant's mood appeared anxious and affect was

dysphoric, he denied any recent suicidal or homicidal thoughts and was rated at a "4" using the subjective units of distress (SUDS) 0 to 10 scale. The claimant informed Traylor that his meds were helping, as well as the sessions and he felt encouraged. He also stated that he improved from a 4 to a 2 on the SUDS, demonstrating further improvement (Exhibit 4F/14). Therefore, the undersigned finds this opinion should be afforded little weight as the sources (sic) own records undermine its supportability and credibility. In addition, the claimant's own substantial work activity and actual daily activities reveal a significantly greater mental functional ability than alleged.

Moreover, under our current regulations, "acceptable medical sources" are: licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists (See 20 CFR 416.913(a)). Making a distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" facilitates the application of our rules on establishing the existence of an impairment, evaluating medical opinions, and who can be considered a treating source. Here the opinion was given by a counselor/therapist and thus, cannot be afforded controlling weight, as is the case for "acceptable medical sources." However, the undersigned has duly considered the opinion of this practitioner in accordance with 20 CFR 404.1527(d) and 416.927(d) and has given it little weight.

A mental residual functional capacity assessment completed by a state agency medical consultant indicated the claimant would be able to understand, remember and carry out detailed, but not complex instructions, make basic decisions, concentrate for extended periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting (Exhibit 7F). The undersigned affords this opinion some weight as it is consistent with the medical evidence of record, which also supports a conclusion that the claimant is "not disabled." Except, with respect to the ability to perform detailed tasks, the undersigned finds the claimant would be limited to the ability to understand, remember and carry out only simple instructions. Although this physician was non-examining, and therefore their opinion does not as a general matter deserve much as much weight as that of an examining or treating physician, they do deserve some weight, particularly in a case like this in which there exists a number of reasons to reach similar conclusions, as discussed in this decision.

(Tr. 18-19). This summary is accurate and gives fair treatment to all of the diagnoses and expert opinions in the record. The diagnosis and expert opinions factor supports the ALJ's decision.

## C. Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by family and friends. Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment that could reasonably be expected to cause pain. Statements made by the individual or her physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (quoting *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

At the hearing before the ALJ on November 19, 2009, Sonnen testified that he earned a Bachelor of Fine Arts from Alfred University, near Buffalo, New York, in 1994. (Tr. 31). After that, Sonnen held a series of jobs doing administrative and clerical type work at various arts organizations. (Tr. 34-36).

Sonnen testified that he was diagnosed with bipolar disorder in the mid to late 90s.  (Tr. 37).  He claimed that he has been hospitalized for his disorder; the last time he was hospitalized was March of 2009 for a week and a half.  *Id.*  He claimed that at the time of this hospitalization he was compliant with his medication.  (Tr. 38).

With regard to his daily routine, Sonnen testified that it varied: "On the worst days I just get up and use the bathroom and then go back to bed and I just stay in bed all day.  On days that are a little better I'll get up and I'll eat something and then I'll lay down."  (Tr. 41).  Sometimes he watches TV, he does not read, and he has no other hobbies that interest him during the day.  (Tr. 41-42).  He checks his email once a week but only keeps in touch with two friends and his father via email.  (Tr. 42-43).

Sonnen claims to have no issues with marijuana or alcohol.  (Tr. 44).  He said the last time he smoked marijuana was late January or early February of 2009 and that it was a "one time thing."  *Id.*  He claimed that he does not drink very often; he had a glass of wine two or three weeks before the hearing and does not remember the last time he drank before that.  (Tr. 45).  He admitted to trying heroin, meth, and ecstasy in high school.  (Tr. 44-45).

With regard to his symptoms and their effect on his ability to work, Sonnen testified that between his manic episodes and his depressive episodes, he was missing a week of work per month.  (Tr. 61).  When he did work he would need to take five to fifteen minute breaks every 30 to 45 minutes, and he was only at work for four or five hours per day.  *Id.*  He also claimed to have daily crying spells.  (Tr. 63).  Sonnen claimed that clerical type jobs like labeling were especially difficult because he had to "just []sit and stew in [his] thoughts."  (Tr. 59-60).  When he was depressed he would find himself "incredibly tired" and "really forgetful," he had

difficulty showing up to places on time, could not concentrate for long periods of time, and he would mess up the order of photocopying. (Tr. 45). When he was manic, which did not happen as often, he would stay awake for days at a time, was unable to drive, exhibited anti-social behavior, could not control his spending, and he would isolate himself because he is embarrassed of his behavior when he is manic. (Tr. 46-47). When Sonnen was manic he would not go to work because he was so embarrassed. (Tr. 61). He testified that he would have a manic episode every three to six months but later testified that it would happen about every six months. (Tr. 47, 61). Sonnen claimed to have suicidal thoughts about 3/4s of the year. (Tr. 47).

At the hearing before the ALJ, Sonnen's former employer, Debra Salar, also testified. (Tr. 48). Salar met Sonnen in 2002 and saw him at art shows and art events throughout 2002 and 2003. (Tr. 48-49). Salar hired Sonnen in 2004 to cover for her during pregnancy. (Tr. 50). Sonnen was the only employee. (Tr. 51). Salar came back gradually from her six month leave; when she started being in the office more she became "aware that [Sonnen] needed a lot more guidance and supervision than [Salar] had first envisioned." *Id.* Salar testified that she had to constantly supervise Sonnen: "We had to keep a task list and do a check list of is this done, is this done, is this not done, why is it not done. There were a lot of questions like that that had to be sort of gone over repeatedly." *Id.* When asked how Sonnen compares to Salar's current employees, Salar said that her current employees needed less supervision and were better at getting their tasks done on time. About Sonnen, Salar said "[h]e was very earnest and had a lot of desire and intent and I always appreciated that. And I found out later that he was working extra hours to make up the time but jobs had to be redone and different files had to be redone." (Tr. 52).

Originally Sonnen was supposed to come in every day and work five hours but, "over time it became so he would contact [Salar] at the end of each week or the beginning of each week and say, well, these are the hours I'm going to work." *Id.* Salar said that she was more flexible than she should have been with this habit of changing hours on his own. (Tr. 52-53). Sonnen would sometimes not come in to work until the afternoon like 1:00 pm or 2:00 pm and he would even come in as late as 4:00 pm. (Tr. 53). Salar testified that "[t]here were weeks where [Sonnen] would have illness and he would call [Salar] and say, I can't come in." *Id.* When asked if Sonnen regularly came to work five days a week, Salar replied,

> [s]ome days if he couldn't make it at the top of the week he would come later, it just depended. It got worse gradually. The first couple of years he was fairly good. He needed supervision, guidance, counselors, got the job done. By 2006 when I was in the office a lot more and maybe because I was in the office more I saw that he was not really an efficient worker.

(Tr. 54). Salar claimed that at work Sonnen would sometimes "drift off and just sort of stare into the sky." *Id.* Towards the end of Sonnen's employment, this drifting off happened a lot more often. *Id.* Salar testified that Sonnen's attendance was very poor in 2007 and 2008; by the end of his employment, Sonnen would miss half of the time he was supposed to be at work. (Tr. 58).

Salar testified that there were times when she would bring work to Sonnen's home. (Tr. 55). She did this in 2007 and when asked what Sonnen's apartment looked like Salar replied, "I was only at the entrance and I just remember being shocked by just his landscape of dishes and clothes and smells." *Id.* Salar testified that in 2007 and early 2008 Sonnen was not presentable; he was not shaven, he was smelly and dirty, he wore dirty clothes, and, overall, his appearance was not pleasant. (Tr. 55-56). Salar had to tell Sonnen to change or clean up because he was getting to be an embarrassment during meetings. (Tr. 56). Salar was forced to begin taking

34

responsibilities away from him and took them on herself.  (Tr. 56).  This had a heavy toll on the

organization and her family.  (Tr. 58).  If Salar confronted Sonnen about mistakes, Sonnen "was

very emotional, of course," would look close to crying, and then he would just walk out of the

office.  (Tr. 57).  When asked what Sonnen was like in 2008 and what Salar's final decision as

far as Sonnen's employment was concerned, Salar replied, "I felt that we had made enough

accommodations and while I really understood and appreciated his sincerity and desire to work,

by that point he no longer had the ability and he didn't have the ability for six months prior to

that point or maybe even earlier."  *Id.*

Salar said that Sonnen "was a learning experience in terms of how [she] hire[s] and

train[s] today."  Salar's current employees have set hours, a set job, and the work very rarely

does not get done.  *Id.*

Regarding Sonnen's subjective evidence of disability, the ALJ wrote:

> The claimant testified that he graduated from college in 1994 with a Bachelor's of
> Fine Arts and reported that he held various administrative and clerical jobs in the
> past, including that of an arts director.  He testified that he was last employed in
> the spring of 2008 as an office assistant with duties that included photocopying,
> getting mail and answering phones.  The claimant testified that he can no longer
> work due to depression and his bipolar disorder.  He stated that it is difficult to
> find motivation to get out of bed.  He has difficulty with concentration and often
> has racing thoughts.  During manic episodes he has difficulty controlling his
> behavior, and often becomes argumentative and impulsive.  These episodes occur
> 3-6 times per month, according to the claimant.  He stated that he was recently
> hospitalized in March 2009 for a manic episode and has several emergency room
> visits for the same.  He receives treatment through MHMRA and sees his
> psychiatrist every three months and a counselor every two weeks.  He testified
> that he is compliant with medications, but the doctors are still trying to find a
> combination that works.

35

As far as activities of daily living, the claimant testified that on bad days he stays in bed all day, but on better days he watches television, uses the computer and emails friends occasionally.  The claimant admitted to past substance abuse and testified that he last used marijuana in February 2009 and drinks occasionally.  He testified that he is independent in his daily activities and does occasional cooking and cleaning.

The claimant presented a witness to offer additional testimony on his behalf.  Sehba Sarwar testified that she was a former employer of the claimant.  Sarwar testified she hired the claimant in 2004 as an assistant.  However, the claimant did not perform as she had hoped.  Sarwar testified that claimant needed more guidance and assistance than she first thought.  The claimant was not staying on task and needed a checklist.  He would often come in late and sometimes not at all.  Other times, he smelled or did not present with proper hygiene.  Overall, he was not an efficient worker and needed extra hours to do a job that her current employees perform within the required time constraints.  In the end, Sarwar testified that she could no longer make any further accommodations for the claimant and his employment was terminated in 2008.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The medical evidence of record demonstrates a history of bipolar disorder and related treatment (Exhibit 2F).  However, despite the claimant's allegations of disabling symptoms related to his mental impairment, the record fails to support the alleged severity of the claimant's condition, in the absence of substance abuse.  A treatment note dated February 25, 2006 is one of the earliest evidence establishing the claimant's mental impairment.  No mental impairment evidence exists in the record prior to an office note dated June 2, 2005.  The record shows that the claimant reported a history of bipolar disorder and related symptoms of racing thoughts, irritability, decreased sleep, and depression.  The claimant was diagnosed with bipolar disorder and noted to be only mildly depressed.  He was also given a global assessment of functioning ("GAF") score of 65, which according to the Diagnostic and Statistical Manual Mental Disorders – Fourth Edition is indicative of only moderate symptoms or difficulties in social, occupational or school functioning (Exhibit 1F/3).  Records from the Mental

Health and Mental Retardation Authority ("MHMRA") of Harris County reveal similar moderate symptoms and also substance abuse. At a psychiatric assessment dated June 2, 2006, the claimant reported that he was having difficulty keeping a schedule, insomnia, fatigue, social withdrawal, poor concentration, and poor self-esteem (Exhibit 2F/1). However, he also reported a history of drug abuse that included heroin, methamphetamines, marijuana, alcohol, ecstasy, acid and mushrooms; and admitted to regularly using marijuana and alcohol (Exhibit 2F/2). Even with his drug use, he reported no significant anxiety an (sic) no panic attacks, no current manic symptoms, no current auditory or visual hallucinations or paranoia; and even indicated that he was working 20 hours per week, but stated that he couldn't work more due to being overwhelmed. On a scale from 0-10, "0" equaling no symptoms, "5" equaling moderate symptoms and "10" equaling extreme symtoms, (sic) the physician rated the claimant's mania as a "4" and depression as a "1", which further demonstrates the relatively mild to moderate nature of the claimant's symptomology (Exhibit 2F/1). A mental status examination revealed the claimant was neatly groomed, cooperative and goal directed. Although insight was limited and judgment was fair, the claimant was alert, his affect was appropriate and hallucinations, delusions and suicidal or homicidal ideation were all absent (Exhibit 2F/2). The claimant was continued on his bipolar and depression medications with no reported side effects (Exhibit 2F/3).

The record demonstrates that claimant continued treatment on a regular basis without any significant changes in his symtoms (sic). A December 2006 note shows the claimant reported that he has been "up and down" because his moods are depressed in the morning and improve throughout the day. The undersigned notes that it is reasonable to presume that the improvement in symptoms through the day would be the result of medication compliance. The claimant reported he was eating and sleeping well, had variable energy and motivation, fair concentration, and only mild avoidance and social withdrawal. His self-esteem was good and he exhibited no suicidal or homicidal ideation. The claimant also reported some work stressors, but reportedly was working 30 hours per week (2F/39). This contradicts the claimant's previous reports that his mental impairments prevented him from working over 20 hours per week. This strongly suggests that the claimant can do more than he alleges and further undermines the credibility of the claimant's allegations regarding the severity of his symptoms (See also 3F/23, claimant reported working 40-50 hours per week).

(Tr. 16-17).

To reject as not fully credible Sonnen's complaints of disabling symptoms due to his

bipolar disorder the ALJ relies in part on his finding that Sonnen has substance abuse problems:

"the record fails to support the alleged severity of the claimant's condition, *in the absence of substance abuse*." (Tr. 17) (emphasis added).  As discussed in the objective medical evidence section, the ALJ's finding that Sonnen has substance abuse problems is not supported by substantial evidence.  From the quote, it appears that the ALJ first concluded that Sonnen has current substance abuse problems and then rejected any evidence in the record that corroborated Sonnen's alleged severity as resulting from substance abuse as opposed to bipolar disorder.  However, later in the decision the ALJ appears to take all evidence into account and determines that Sonnen is not disabled: "[e]ven with his drug use, he reported no significant anxiety an (sic) no panic attacks, no current manic symptoms, no current auditory or visual hallucinations or paranoia; and even indicated that he was working 20 hours per week, but stated that he couldn't work more due to being overwhelmed." *Id.*  Thus, it is unclear to what extent the ALJ's reliance on his unsupported finding that Sonnen has substance abuse problems affected his credibility analysis.

With regard to Debrah Salar's testimony, the ALJ did not indicate what weight he gave to her testimony nor why he it gave that weight.  Salar's testimony seems especially relevant because she, a previous employer who was able to observe Sonnen on a day to day basis, testified that Sonnen does not have the ability to maintain a job that only required twenty hours of his time per week: "[Sonnen] no longer had the ability [to work] and he didn't have the ability for six months prior to that point or maybe even earlier." (Tr. 57).  This is at odds with the ALJ's RFC finding and the ALJ's finding that Sonnen's "employment ended due to a reduction in force and not related to any manic symptoms or other complications related to his mental impairment." (Tr. 14, 15).  Salar's testimony was that Sonnen lost his job because of severe

functional loss which is contrary to the ALJ's finding that "[a]ny periods of severe functional loss or increased symptomology have been the result of loss of employment, drug use or noncompliance with medications."  (Tr. 17).

Because the ALJ did not provide an explanation of the weight he gave to Salar's testimony and it is unclear to what extent the ALJ relied in incorrect findings to determine Sonnen's credibility, this factor does not support the ALJ's decision.

**D. Education, Work History and Age**

The fourth element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. ß 423(d)(2)(a).

Based on the above analysis, substantial evidence does not support the ALJ's finding that Sonnen has current substance abuse problems.  This error has influenced the remainder of the ALJ's conclusions, including the ALJ's RFC determination, to an unknown extent.  Thus, it cannot be determined from the record whether the ALJ's RFC determination if factually and legally supportable and whether the testimony of the vocational expert can constitute substantial evidence that Sonnen can engage in substantial gainful work that exists in the regional and national economy.  As such, this final factor cannot be said to weigh in favor of the ALJ's decision.

## VI. Conclusion and Order

As the objective medical facts and subjective evidence of pain and disability factors do not weigh in support of the ALJ's decision the Court ORDERS that Plaintiff's Motion for Summary Judgment (Document No. 19) is GRANTED, Defendant's Motion for Summary Judgment (Document No. 13) is DENIED, and the matter is REMANDED for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 13ᵗʰ day of August , 2012.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE